STATE of Missouri, Respondent,

v.

Larry HARVEY, Appellant.

No. WD 32147.

Missouri Court of Appeals, Western District.

Sept. 21, 1982.

Motion for Rehearing and/or Transfer to the Supreme Court Overruled and Denied Nov. 2, 1982.

Application to Transfer Denied Dec. 13, 1982.·

L.D. Mayo, Jr. (argued), Kansas City, for appellant.

Kelly S. Klopfenstein (argued), Asst. Atty. Gen., and John Ashcroft, Atty. Gen., Jefferson City, for respondent.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

NUGENT, Presiding Judge.

Larry Harvey appeals his conviction of attempted rape following a jury trial. The trial judge sentenced him to three years imprisonment. We affirm.

Defendant was charged in two counts with sodomy of his eleven-year-old stepdaughter, Rachelle, in violation of § 566.060,[1] and in a third count with attempted rape of Rachelle in violation of § 566.060.[2] All of the counts related to acts alleged to have been performed on or about June 16, 1979. A mistrial was declared as to the sodomy counts.

Trial commenced on July 28, 1980. The state made an oral motion in limine that any reference, either direct or indirect, to Rachelle's having been the victim of a prior unrelated sexual assault be prohibited. The defense argued against the motion:

> MR. MAYO: Your Honor, the defendant would seek to introduce this evidence for the limited purpose of showing the prior knowledge of sexual matters of this little girl. She will introduce a very explicit statement with regard to Mr. Harvey. I think the fact that she does have prior sexual knowledge is relevant in this case to assess her credibility in that regard. We would not introduce this evidence to impeach her character in any way. Certainly, it is not impeachable to have been the victim of a rape, and we intend to make no argument to that end. We do feel that it is also relevant that the outcome of this particular reported incident of rape was inconsequential, insofar as the alleged perpetrator is concerned, and that that might have a bearing on the attitude of this girl in reports of sexual abuse, which is also relevant in this case.

The trial judge sustained the state's motion.

Sherita Bates, a social worker, began to work with the Harvey family in March, 1979, when Mrs. Harvey's five children were placed in foster care because Debra Harvey, Harvey's former wife, had abused them. Mrs. Bates took Rachelle and defendant's daughter, Belinda, for a weekend visit with Harvey on June 15. She picked them up on June 18 to return to their foster home. After a hearing the next day, the juvenile court placed the four younger children in Mrs. Harvey's custody and placed Rachelle in the custody of defendant, her stepfather. On June 21, however, the juvenile court directed Mrs. Bates' supervisor, Ms. Patricia Brown, to take protective custody of Rachelle because Mrs. Harvey and Belinda had accused defendant Harvey of sexual abuse of Rachelle on the weekend of June 15. The two social workers and Detective Elaine Dalton met defendant at his home, explained the allegations to him and took Rachelle into custody, placing her in Children's Mercy Hospital. There Officer Steven Clark made a police report.

Mrs. Bates testified that Rachelle and Belinda had made no mention of any sexual impropriety on June 18 or 19. Her recommendation that Rachelle be placed in Harvey's custody[3] was based on Rachelle's hostile feeling toward her mother, Rachelle and Belinda's wish to be placed there, Harvey's interest in both girls, and the favorable evaluation Harvey received from a psychologist.

Detective Dalton took Rachelle's statement on June 21 and another statement on September 11. In both statements Rachelle reported previous sexual impropriety with Harvey beginning, according to one statement, when she was seven, or, according to the other, when she was nine or ten. In the first statement she first gave June 18 and then June 16 as the date of the abuse. Of the first statement, Detective Dalton testified, "I think she was tired and nervous, and I think at that particular time she probably would have said anything that she thought we wanted to hear just to get it over with, because she wanted to just get it over with." Both statements described acts of cunnilingus and masturbation by Harvey.

---

1. All sectional references are to Missouri's Revised Statutes, 1978.

2. The apparent error in charging defendant with attempted rape under § 566.060 (sodomy) rather than § 566.030 (rape) is not raised in this appeal. We note, nevertheless, that this clerical error does not affect the substantive rights of defendant and is, therefore, harmless under Rule 29.12(a).

3. Mrs. Bates also recommended that Harvey be given custody of Belinda. Harvey testified that Belinda preferred to live with her mother.

Officer Clarence Gibson took Rachelle's and Belinda's statements on October 4. In this statement Rachelle related acts of fellatio and attempted intercourse in addition to the cunnilingus she had previously reported. She did not recall Belinda observing them but said that Harvey had slept with Belinda on June 16. In her statement, Belinda said that on June 16 she saw her father on top of Rachelle doing "the hoochie-koochie". She had seen him do that twice before with Rachelle but defendant had not done it with her. Harvey had seen her watching them and had told her to "get out".

Reginald Williams, Mrs. Harvey's sixteen-year-old brother, testified that after the court hearing on June 19 Belinda told him of the sexual improprieties of the June 15 weekend. He reported the conversation to Mrs. Harvey.

Belinda Harvey, nine years old at the time of trial, testified that on the night in question she saw Rachelle and Harvey in bed doing the "hoochie-koochie". Rachelle had her nightgown on. She stated that Harvey did not see her watching them. On cross-examination she said the incident occurred on June 16. She recalled that in an earlier statement (taken on September 11), she had said that Rachelle only wore her panties. She defined "hoochie-koochie" as "you get in another person". She admitted describing in a deposition acts of intercourse between Harvey and Rachelle.

Although Rachelle Harvey, twelve years old at the time of trial, did not remember the date of the assault, she testified that Harvey called her into his bedroom to watch television after dinner. When Harvey went downstairs, she went to sleep on his bed. Harvey awakened her by taking off her clothes. She further stated that Harvey, himself nude, "started licking me between my legs", "tried to get his penis in" and put his penis in her mouth. She repeated that Harvey had done these things when she was seven years old and at other times.

Jacqueline Harvey, the defendant's aunt as well as his former mother-in-law, testified that in April, 1980 she had said to Harvey, "Now you can't say that they're lying on you about Belinda and Rachelle, can you?" According to this Mrs. Harvey, the defendant replied, "No, I guess not." Jacqueline had asked for custody of the children when Harvey received custody of Rachelle the previous June.

Defendant's motion for judgment of acquittal at the close of the state's evidence was overruled.

Mrs. Bates, called as a defense witness, stated that on June 21, both Harvey and Rachelle denied any sexual relations. Rachelle told her that she thought their mother "had put Belinda up to saying things."

Ruby Cothran, Rachelle's foster mother from June 21 to October 11, testified that Rachelle's reputation among the people with whom she lives was "not very good for speaking the truth".

Defendant's mother, Betty Haycox, testified that Rachelle had lived with her from the time Rachelle was two months old until she was seven years old. When Rachelle was seven, Harvey was an inmate of an Oklahoma penitentiary. Contrary to Rachelle's testimony, Mrs. Haycox said that Rachelle had never reported any sexual contact with Harvey.

Ernestine Wright, custodian of the medical records at Children's Mercy Hospital, read the following paragraph from a form entitled "Suspected Sexual Assault" dated June 21, 1979, concerning Rachelle.

On questioning patient she denied ever being in bed with Mr. Harvey or ever having Mr. Harvey touch her breasts or genitals or ever seeing Mr. Harvey without his clothes.

The state moved that the rest of the report not be admitted on the basis that the omitted portion contained statements of the doctor which were impossible for a lay person to interpret or read. The court sustained the motion.

Larry Harvey, testifying in his own behalf, stated that he was in the Oklahoma State Penitentiary from 1973 to 1978. He returned to Kansas City in June, 1978. He

lived with Debra, from whom he was divorced in 1974, until December, 1978. In January, 1979, he reported to the Child Abuse Hotline that Debra and her boyfriend had been abusing the children. The Division of Family Services took the children on January 19. Harvey received custody of Rachelle on June 19. Except for problems when putting Belinda to bed, the weekend visit in June was uneventful. He testified that nothing of a sexual nature had ever taken place between Rachelle and him: "She is my daughter, why would I?" He denied acknowledging to Jackie Harvey sexual misconduct with his daughters.

The jury began its deliberations at 10:40 a.m. Subsequently, it sent the following request to the court: "We, the jury, feel it is necessary to view all evidence submitted in this case." The court proposed permitting the jury to see Defendant's Exhibits 1 through 5, the written statements of Rachelle and Belinda. Defendant's objection that "these documents . . . would overshadow that testimony [of the witnesses] and unduly weight the contents of the exhibits in the jury's mind" was overruled.

Later the jury asked, "Do the sentences run at the same time or one added to another, and who decides?" The court answered, "The jury must follow the instructions. The Court cannot answer your questions.

After more deliberations, the jury sent the following message: "Does the jury have to come to a unanimous decision on the term of imprisonment?" The trial judge announced to counsel, "I will call the jury in and inquire as to whether or not they have agreed on guilt but haven't agreed on punishment. If that be the case, I will at that time read 4.50 [4] and the appropriate forms of verdict."

Thereafter, the record reveals the following proceedings:

THE COURT: Members of the jury, the Court acknowledges your question. Would the foreman raise his hand, please?

Do I understand from your question that the jury has agreed unanimously on guilt but cannot agree on punishment?

FOREMAN SHIELDS: Yes, on one verdict—or on one count.

THE COURT: All right. The Court will now read to you an additional instruction, Instruction 17 [5], which will be handed to you with additional forms of verdict.

After further deliberations, the jury returned and the following colloquy ensued:

THE COURT: Members of the jury, have you arrived at a verdict in this case?

FOREMAN SHIELDS: No, we have not.

THE COURT: It has now been nearly eight hours that you've been deliberating. Do you believe that with further deliberation you could arrive at a verdict?

FOREMAN SHIELDS: I would hate to speculate on that. I think we are relatively—we've got some minor problems, and we might be able to iron them out, but I sure can't promise that.

At a conference at the bench, the prosecutor then urged the court to give the jury the "hammer" instruction. Defense counsel suggested that the trial end. The court then told the jury,

Members of the jury, the Court appreciates your efforts in this case, and the Court also appreciates that this jury is as qualified as any other jury would be in deciding the case. In view of Mr. Shields' indication that you may have minor problems, I'm going to suggest to you that you continue deliberating for a reasonable length of time. I'm obligated to tell you that I don't have any facilities to feed you. That's not the only test. The question is whether or not you can arrive at a verdict.

I'm going to ask you to return to the jury room and to have a discussion on

---

4. MAI CR 4.50 is entitled "Verdict Possibilities: Inability of Jury to Agree Upon Punishment or Upon Guilt as to All Counts or All Defendants".

5. Instruction 17 is not included in the appeal record.

whether or not you can reach a verdict. I'm not going to poll you individually, but I'm going to ask you to return to the jury room and resume your deliberations, with a particular view toward whether or not you think you can reach a verdict in this case, and I'll ask you to have some kind of a response, either that you can, with time, reach a verdict, or you do not believe you can reach a verdict, at 6:30.

The jury found Harvey guilty of attempted rape, but could not agree on punishment. The court declared a mistrial as to the sodomy counts and sentenced Harvey to three years imprisonment.

On appeal, Harvey claims prejudicial error on the following five points: (1) granting of the state's motion to exclude evidence of a prior unrelated sexual assault on the prosecutrix; (2) instructing the deadlocked jury to return for deliberations nearly eight hours after submission; (3) overruling Harvey's motion for acquittal at the close of the evidence; (4) sending only the documentary exhibits to the jury; and (5) refusing to admit certain offered portions of Defendant's Exhibit 8.

### 1. *Exclusion of evidence of earlier sexual assault*

■ Harvey argues that the trial judge abused his discretion and denied him the opportunity to present relevant and material evidence when he prohibited any reference to a prior unrelated sexual assault on Rachelle. Defendant contends that the jury should have been made aware that Rachelle had knowledge of sexual acts and terminology prior to the defendant's alleged actions, because the natural inference is that a very young girl with unusually extensive sexual knowledge must have gained that knowledge from a sexual encounter. Where the only sexual encounter before the jury involved the defendant, he argues that the jury is left with the assumption that his alleged actions were the source of her knowledge. He also contends that the fact that Rachelle had made a previous sexual assault charge which did not produce a conviction is relevant to this case because the likelihood was that she thought that she

could accuse her stepfather of the same offense without jeopardy to him. Therefore, he argues, she gave in to police pressure to say, "anything she thought we [the police] wanted to hear just to get it over with". The exclusion of this evidence, Harvey concludes, resulted in denying him his federal and state constitutional rights of confrontation and cross-examination.

We do not agree. Defendant's intent in seeking to introduce evidence relating to Rachelle's past sexual experience was to attack her credibility by implying that when she described certain acts allegedly performed by defendant, she actually described events which she learned about at that earlier time. Belinda's testimony as to defendant's June 16 conduct, however, weakens defendant's position. She vividly reinforced Rachelle's story of that night's events and undercut defendant's conjecture about Rachelle's state of mind. Even if defendant's speculations about Rachelle's earlier experience, her knowledge and her views could be shown to be so, Belinda's testimony itself was in any event sufficient to establish the charge against defendant.

But defendant's request was based on no more than mere speculation. He did not offer to show that Rachelle would testify that, because she made an earlier charge without serious consequence, she believed she could without fear charge her stepfather with the same offense. Instead, he offered only the inference that the outcome of this earlier reported incident of rape "might have a bearing on the attitude of this girl." The jury would have been asked to conclude solely from the circumstances of the prior charge that Rachelle thought she could charge anyone with rape with impunity. Such evidence is too speculative and remote to warrant admission. Moreover, the argument is weakened by the fact that Rachelle did not initiate the charge; her mother and sister did.

Accordingly, we find that the trial court did not abuse its discretion in governing the scope of cross-examination. *State v. Dunn,* 577 S.W.2d 649, 653 (Mo.1979) (en banc).

## 2. The "hammer" instruction

■ Harvey next contends that prejudicial error occurred when the trial court instructed the jury "to return to the jury room and to have a discussion on whether or not you can reach a verdict...." Harvey argues that this instruction was directed to the subject of MAI–CR 1.10 and is prejudicial error under *State v. Hayes*, 563 S.W.2d 11 (Mo.1978) (en banc). In the alternative, he argues that if the instruction was not directed to the subject of MAI–CR 1.10, it was erroneous under Rule 28.02(d) and (f).[6]

MAI–CR 1.10, the "hammer", reminds the jury among other things that:

The trial of a lawsuit involves considerable time and effort, and the parties are entitled to have their rights determined once and for all in every case. The twelve jurors chosen to try this case should be as well qualified to do so as any other twelve that might hereafter be chosen.

In the instant case the trial judge was not directing the jury to attempt to agree upon a verdict, as MAI–CR 1.10 suggests, but was asking them to determine if they could reach a verdict. The record indicates that the jury had been deliberating some eight hours. Since it was late in the day, the trial judge needed to know if deliberations the next day would be necessary. The only phrase in his instruction reflecting the "hammer" was: "this jury is as qualified as any other jury would be in deciding the case." The instruction was not a "hammer" or even a "half-hammer". Therefore, it is not guilty of the error found in the *Hayes* instruction which omitted the caution that "no juror should ever agree to a verdict that violates the instructions of the Court, nor find as a fact that which under the evidence and his conscience he believes to be untrue."

■ The trial judge's reminder, if it was an instruction, did not fall within the requirements of Rule 28.02(d), Guide for Form of Instructions Where MAI–CR Not Used, and (f), Procedure for Marking Instructions. Any error which occurred, however, will cause reversal only if it prejudiced the defendant. *State v. Davis*, 608 S.W.2d 437, 441 (Mo.App.1980); Rule 29.-12(a). We find no prejudice. The jury appears to have reached its verdict before the judge made his remarks and without pressure from the trial judge.

## 3. Denial of motion for acquittal

For his third point, defendant contends that the trial court erred in overruling his motion for acquittal at the close of the state's evidence because the evidence against him "self-destructs" with the inconsistencies and contradictions of the witnesses' stories. He refers to contradictions in Rachelle's statements as to the date of the attempted rape, the clothing which she and the defendant wore, and the defendant's attempted coitus (as she testified at trial) or cunnilingus and masturbation (as Defendant's Exhibit 1 showed). Defendant also points to Belinda's failure to testify that she saw defendant do anything with his head or mouth (in contrast to Rachelle's testimony), as well as to contradictions as to whether defendant ordered Belinda out of the room when the attempted rape occurred.

In considering the sufficiency of the evidence in a criminal case, we are required to construe the evidence most strongly in favor of the prosecution, considering all favorable inferences that can be legitimately drawn. Inferences and evidence to the contrary are to be disregarded. *City of Kansas City v. Oxley*, 579 S.W.2d 113 (Mo.1979) (en banc).

■ While we will not weigh the evidence of the trial court if the verdict was supported by substantial evidence, we must scrutinize the record to assure that the evidence was indeed substantial. *State v. Gregory*, 339 Mo. 133, 96 S.W.2d 47 (1936).

■ In the case before us, the evidence turns on the credibility of Belinda and Rachelle. Generally, when the credibility of a

**6.** In his brief the appellant cites the prior Rule 20.02.

witness is at issue because of discrepancies in the testimony, the matter is one for the jury to decide. A jury is free to believe all, some or none of the witness' testimony in light of the facts, circumstances and other testimony in the case. *State v. Holt*, 592 S.W.2d 759 (Mo.1980) (en banc). A defendant is not entitled to a judgment of acquittal merely because of discrepancies or conflicts in the testimony of state's witnesses. The fact that a witness' testimony is contradictory does not prevent it from constituting substantial evidence. *State v. Newberry*, 605 S.W.2d 117 (Mo.1980).

More specifically, the rule of law which governs the credibility of uncorroborated witnesses in rape cases is that "[e]vidence by the victim inherently contradictory or such as to leave the court clouded with doubt must be corroborated or the conviction will not stand." *State v. Rogers*, 583 S.W.2d 293, 295 (Mo.App.1970). Further, such evidence may be deemed insufficient if it "conflicts with the physical and surrounding circumstances or with common experience so as to be so unconvincing and improbable that it is extremely doubtful." *State v. Mazzeri*, 578 S.W.2d 355, 356 (Mo. App.1979).

While the rules cited deal with the sufficiency of *uncorroborated* testimony, we look to them for guidance in this case where the credibility of both the prosecutrix and her corroborator is raised by defendant. Doing so, we must consider whether the testimony by Belinda and Rachelle is so contradictory as to leave us "clouded with doubt" or "extremely doubtful". The cases where these phrases have been applied are instructive.

Recent cases have held that where a rape victim's testimony has been inconsistent in collateral matters, no "cloud of doubt" is created. In *State v. Johnson*, 595 S.W.2d 774 (Mo.App.1980), for example, the victim contradicted herself as to whether she was grabbed on the porch or inside the house; at what time one of the defendants was first seen; at what time one of the defendants bent her fingers and jeered at her; whether certain acts of rape and sodomy by two defendants were performed simultaneously; and whether she had escaped with assistance or been allowed to leave. The court found these inconsistencies to be minor points of a nonessential nature, and noted the absence of discrepancies as to the essential elements of rape and sodomy. Because of their collateral nature, the contradictions were held not to cloud the testimony with doubt.

Similarly, in *State v. Mazzeri, supra,* although the victim gave untrue statements to the police concerning her activities earlier on the evening of the rape, the reason for her being afoot on the highway, and whether she was forced into defendant's car, her testimony was found to be substantial enough to be submitted to the jury because none of the contradictions went to the essential elements of rape.

In the case before us, inconsistencies as to the date of the attempted rape, the clothing worn by Rachelle and the defendant, and whether Belinda was ordered out of the room are similarly nonessential and collateral and, therefore, do not raise a significant "cloud of doubt". Inconsistencies in testimony on the subject of whether the defendant actually attempted penetration or cunnilingus and masturbation are of greater significance, dealing as they do with one of the essential elements of the crime (attempted penetration). Were such inconsistencies to occur in testimony given by a mature woman, the defendant's point might well be persuasive. Here, however, we are dealing with testimony by girls of twelve and nine. As stated in *State v. Ginnery*, 617 S.W.2d 115, 117 (Mo.App.1981), where a thirteen-year-old girl testified to her rape by a friend's father, "[i]t is not uncommon for there to be some contradictions or memory lapses during the testimony of a child of tender years."

Moreover, although Belinda's statement that she did not see the defendant do anything with his head or mouth, but only saw him "hoochie-koochie", appears to contradict Rachelle's testimony that he licked her between her legs, her testimony reinforces Rachelle's on the essential point that an

attempt at intercourse ("hoochie-koochie") occurred.

In addition, Rachelle was consistent in her testimony at trial that defendant attempted penetration. Inconsistencies appeared only between her trial statements and earlier statements.

Construing the evidence in favor of the prosecution as we must, we hold that the jury, which had the benefit of viewing the witnesses' demeanor, and actually heard Rachelle testify at trial that defendant "tried to get his penis in", could legitimately infer that any contradictions between her trial testimony and earlier statements were the result of childish nervousness and confusion from being repeatedly questioned on the same events, and did not raise a reasonable doubt as to whether defendant actually attempted to commit rape.

### 4. Sending only documentary evidence to the jury

In his fourth point, defendant asserts that the trial court erred in sending only documentary exhibits to the jury in response to a request "to view all evidence submitted", on the grounds that by sending only the exhibits, the court singled out and emphasized this evidence to the exclusion of all the oral testimony in the case.

We find no merit in this contention.

The parties agree that it is within the trial court's discretion to allow the jury to take exhibits into the jury room. In *State v. Hale*, 371 S.W.2d 249, 257 (Mo.1963), where defendant claimed that allowing the jury to view certain exhibits gave undue emphasis to such exhibits and completely ignored oral testimony, the court held that this is completely within the discretion of the trial court.

Defendant cites *State v. Jordan*, 532 S.W.2d 776 (Mo.App.1975), as standing for the proposition that when "all" evidence is requested by the jury, the court has an obligation, if it submits only documentary evidence, to draw the jury's attention to the fact that oral testimony was presented as well. *Jordan* cannot be so interpreted. The evidence at issue in that case was fin-

gerprints which the court denied the jury on the basis that such evidence is "capable only of professional interpretation." The comment by the court that the jury "had heard the direct evidence of the interpretation of the fingerprint evidence on the cross-examination of witness(es)" merely explained why the prints were not being furnished and "informed ... the jury that the weight of the evidence was for them to determine." *Id.*, at 782. The opinion in *Jordan* does not suggest that such a reminder is necessary or even desirable.

Defendant's reliance on *Jordan* is tenuous as well in light of the fact that the jury here was not clearly asking for oral testimony. Use of the word "view" suggests the jury had in mind looking at documents rather than listening to testimony.

In any event, while notes of the reporter may be read to the jury if both parties consent, *State v. Dowe*, 432 S.W.2d 272 (Mo.1968), the trial court has the discretion to allow or to refuse the request and in so doing, to allow the reading of only part of the total testimony. *People v. Pallardy*, 93 Ill.App.3d 725, 49 Ill.Dec. 161, 417 N.E.2d 851 (1981).

The trial court was not obliged to permit a reading of the transcript, if that was the jury's request.

### 5. Admission of the medical report

Finally, we reach defendant's fifth point, that the trial court erred in refusing to admit offered portions of Defendant's Exhibit 8 because it contained evidence material and relevant to the impeachment of Rachelle Harvey.

Without reaching the question of whether the unadmitted portions of this exhibit ("Suspected Sexual Assault Medical Report" from Children's Mercy Hospital) are relevant and material, we find no basis for this objection simply because all portions of the exhibit which defendant offered were indeed admitted and heard by the jury in oral testimony.

The trial transcript shows that defense counsel sought to have the "highlighted

part" of this record read into evidence. The court ruled, "I'm going to permit you to elicit from the witness the portion you have outlined for the court." In response to the state's objection to other parts of the report, the court stated, "Well, that's not what he's offering. The only thing I'm ruling on is what's been offered."

Defense witness Ernestine Wright then read the highlighted portions in the presence of the jury. Defense counsel then offered these same portions of Defendant's Exhibit 8, consisting of the identification of the patient, the date, the paragraph on page one which showed Rachelle's denial of any sexual contact with the defendant, the signature of the nurse, and the signature of the physician. When the prosecutor interjected a request that the rest of the document be excluded, the court simply responded again that "the indicated portion of that record that you wish in evidence is in evidence by having been read, and the objection to . . . Defendant's Exhibit 8 is sustained." Those exchanges show that all portions of the document offered by defendant were admitted. Although the remaining portions were not offered, the court nevertheless sustained an objection to their admission.

We hold that the court did not, in fact, refuse to admit offered portions of the exhibit. Because every part of that document which the defendant offered was actually admitted, he is in no position now to claim error on this grounds.

For the foregoing reasons, the judgment of the trial court is affirmed.

All concur.

## ON MOTION FOR REHEARING

### PER CURIAM.

Although we hereby overrule and deny defendant's motion for rehearing or for transfer to the Supreme Court filed under Rules 83.02 and 84.17, one point raised in the motion merits specific response.

As we stated in our opinion, the trial court admitted all portions of Exhibit 8, Suspected Sexual Assault Medical Report, which defendant offered when those portions were read to the jury by witness Wright. Having done so, the trial court's refusal to admit the document itself ordinarily would be of no major concern. The jury was, after all, exposed to exactly what defendant wanted them to know. Here, however, the jury later asked "to view all evidence submitted" and received all the documents. Because Exhibit 8 was not admitted, the jury, of course, did not see it. Defendant contends in his motion that this was "extremely prejudicial error" because Exhibit 8 contained statements by Rachelle inconsistent with her trial testimony (statements which were read to the jury).

■ First, we note that although a subsequent request by the jury for documents may increase the likelihood that detriment to the defendant resulted from the court's refusal to admit the document, it does not, in and of itself, justify a holding that in retrospect the refusal was error. We must first find error in the ruling before any question of whether it prejudiced defendant can be considered.

■ Second, we stated in our opinion that we need not reach the question of whether the trial court properly refused to admit the entire document because all portions offered were admitted in oral testimony. We have not stated that the trial court actually admitted those portions as documentary evidence. Clearly it did not.

Nevertheless, the trial court did not err in refusing to admit the hospital record in this case. Defendant's witness read certain parts of the record, which appeared on all three pages of the document, into evidence. Defendant then offered those same parts of the document as Exhibit 8. The state objected to the admission of the rest of the document, as confusing and prejudicial. The court sustained the objection. Whether or not the court was correct, the defendant cannot now complain of the ruling that the document as a whole was inadmissible, simply because in addition to the reasons stated in our opinion, he did not offer to

separate those parts of the document which the court had already found admissible from those which were inadmissible.

The court is not obliged, when one document contains both admissible and inadmissible material, to excise or redact the good from the bad. When one document contains both, and no effort is made to offer only admissible portions, the court may refuse the entire document. *Ensminger v. Stout*, 287 S.W.2d 400, 407 (Mo.App. 1956). Here, defendant did offer only those parts already held admissible, but when he became aware that the remainder was not ruled on in his favor, he did nothing. Under these circumstances, where the admissible and inadmissible segments are commingled in one document, and the party offering the document is well aware which parts are admissible and which are not, the responsibility lies squarely with the offeror, and not the court, to physically "cleanse" the document of the inadmissible sections, and re-offer it in that form. Defendant's failure to do so precludes him from claiming error in the court's refusal to accept the document.