**STATE of Missouri, Respondent,**

v.

**David L. GRIFFIN, Appellant.**

No. WD 45748.

Missouri Court of Appeals,
Western District.

July 13, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied Aug. 31, 1993.

Application to Transfer Denied
Sept. 28, 1993.

Robert G. Duncan, Duncan, Coulson, Schloss, Chancellor & Norris, Kansas City, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, P.J., and BRECKENRIDGE and Hanna, JJ.

BRECKENRIDGE, Judge.

David L. Griffin appeals from his conviction for unlawful use of a weapon, § 571.-030.1(4), RSMo 1986,[1] for which he was sentenced to one year in prison. Griffin raises three points on appeal claiming that the trial court erred in: 1) denying his motion for judgment of acquittal; 2) submitting Instruction 6, the verdict-directing instruction, without cross-referencing Instruction 5, the self-defense instruction; and 3) refusing to allow Griffin to admit into evidence and to play a tape recording of a telephone call which impeached the credibility of a prosecution witness. The judgment is affirmed.

The instant case is complicated by racial overtones and allegations of a love triangle. These factors increased the tensions surrounding the incident from which the charges against Griffin arose. At the time of the events in the instant case, Griffin was the principal of Westport High School in Kansas City, Missouri. Griffin is black. Jamie Draper was a middle school teacher who had known Griffin for about four years. Michael Grey was a federal prison guard. Both Draper and Grey are white.

There was evidence of an affair between Griffin and Draper several years before the incident at hand. Draper testified that

---

**1.** All statutory citations are to Revised Missouri Statutes 1986, unless otherwise indicated.

they were no longer romantically involved and were now just good friends. Grey's testimony as to statements made by Griffin was contrary to Draper's testimony and implied an on-going relationship. Conflicting evidence was also presented at trial as to the true nature of the relationship between Draper and Grey. In the light most favorable to the verdict, *State v. Feltrop*, 803 S.W.2d 1, 11 (Mo. banc 1991), *cert. denied*, ─── U.S. ───, 111 S.Ct. 2918, 115 L.Ed.2d 1081 (1991), the evidence was that Grey considered Draper his girlfriend and lover, often sent her flowers, took her out on dates to baseball games and regularly spent Sunday nights with her. Draper testified, however, that she was not Grey's girlfriend and she did not go out on dates with him. She further testified that she did not want him to come over to her apartment so she agreed to meet him at her mother's house, and that he sometimes followed her and had been caught sneaking around her apartment complex. Mark Cason, the resident manager of Draper's apartment complex, testified that he had seen Grey sneaking around the complex and following Draper. Cason had confronted Grey on one such occasion.

On September 23, 1990, Grey attended Draper's softball game in Gladstone. After the game, Draper and Grey drove in separate cars to the home of Draper's mother where they ate dinner. Draper ate hurriedly and left after explaining that she had school papers to grade. Grey testified that he found Draper's actions unusual since he and Draper usually spent Sunday evenings together. Because Draper's actions made Grey suspicious, he went to her apartment about thirty minutes after Draper left her mother's house.

Draper answered the door, closed it behind her and stepped out onto the balcony with Grey. Grey and Draper began to argue after Draper told him that she had an old boyfriend in her apartment. Grey estimated that he and Draper argued on the balcony for fifteen to twenty minutes. During this time Grey observed a tall black man wearing a white baseball cap and glasses standing inside Draper's apart-

ment. Grey later identified this man as Griffin. Draper asked Grey to leave. After Draper went back into the apartment, Grey sat down at the bottom of the steps. Grey heard Draper telling Griffin in a loud voice that she loved him and that Grey did not mean anything to her. Grey, being in an emotionally distraught state, walked around the apartment complex parking lot to collect himself before driving home.

Shortly thereafter, Grey heard Draper's apartment door slam and saw Draper hurry down the stairs and walk away from the apartment complex. Grey testified that Griffin came down the stairs after Draper and drove away in a small Toyota automobile. Grey followed Draper on foot because he wanted to talk to her. Griffin saw Grey following Draper and he drove up to where Draper was walking. Draper got into Griffin's car. Grey turned around to walk back to his car which was still parked at Draper's apartment complex.

When Grey got back to the parking lot, Griffin was blocking the path to Grey's automobile. Grey told Griffin, "[Y]ou and I have something in common, and I don't want any part of it, I just want to get in the car." Grey testified that Griffin ran back to his Toyota and reached in the passenger window, where Draper was sitting. When he turned back to face Grey, he was pointing a pistol at Grey. Griffin approached Grey with the pistol in his left hand and a knife in his right hand. Griffin then knocked Grey to the ground by punching him in the mouth twice. Griffin straddled Grey, hit him in the forehead with the pistol, held the knife to his neck and threatened to blow Grey's head off if Grey did not leave Draper alone.

Grey was able to break away from Griffin when Griffin was distracted by the lights of a car entering the parking lot. Grey ran to his car and drove about two blocks to a fire station where he found two police officers. The officers called for assistance and drove Grey back to Draper's apartment complex. Griffin was just driving out of the parking lot when the officers arrived. The officers pulled Griffin over and placed him under arrest. When asked

whether he had a gun, Griffin told the officers that he did not and that there was not a gun in the car. Draper arrived at the scene of Griffin's arrest shortly thereafter and insisted that there was no gun involved.

At the time of the incident at issue, Tracey Scott lived in the same apartment complex as Draper. Scott observed the altercation from the balcony of her apartment. Scott testified that she saw "a white man down on the ground and a black man over him, straddling him, with a gun to his forehead and a switchblade or knife to his left hand side." Scott heard the white man pleading, "Don't kill me, don't kill me." Scott went to a neighboring apartment and called the police. After the police talked with Scott, they arrested Griffin for aggravated assault and took him to the police station.

During an inventory search of Griffin's car, the police found a three inch dagger-shaped knife which Griffin claimed was a cake-cutting utensil used by his six-year old son during food preparation activities at school. The morning after Griffin's arrest, the police searched the apartment complex grounds and found a gun in a holster. Griffin stipulated at trial that the gun was his.

Griffin was charged with two counts of unlawful use of a weapon. In Count I, he was charged with violating § 571.030.1(4) by knowingly exhibiting a knife and a .380 automatic pistol in an angry or threatening manner. He was charged in the second count with violating § 571.030.1(1) by knowingly carrying concealed upon or about his person a knife. The state entered a nolle prosequi as to Count II at the beginning of trial. At the conclusion of the evidence, the jury was instructed on unlawful use of a weapon under § 571.030.1(4) only as to the gun. Griffin was found guilty and sentenced to one year in prison. He appeals from that judgment of conviction and sentence.

■ Griffin argues in Point I that the jury's guilty verdict was not supported by sufficient evidence. Griffin asserts that the trial court erred in denying his motion for judgment of acquittal because the evidence did not establish the absence of self-defense beyond a reasonable doubt as a matter of law.

■ Section 571.030 provides that a "person commits the crime of unlawful use of weapons if he knowingly: ... (4) Exhibits, in the presence of one or more persons, any weapon readily capable of lethal use in an angry or threatening manner." Self-defense is a defense to a charge of exhibiting a weapon in an angry or threatening manner. *State v. Parkhurst*, 845 S.W.2d 31, 36 (Mo. banc 1992). In a prosecution under § 571.030.1(4), deadly force would only be justifiable if the defendant reasonably believed that he was in imminent danger of "death, serious physical injury, rape, sodomy or kidnapping." *Id.*

■ Griffin asserts that the trial court erred in denying his motion for judgment of acquittal because the state failed to prove the absence of self-defense beyond a reasonable doubt. A defendant is entitled to a directed verdict of acquittal only when the evidence is insufficient to support a guilty verdict. *State v. Blue*, 811 S.W.2d 405, 409 (Mo.App.1991). It is the trial court's responsibility to determine whether there is sufficient evidence from which reasonable persons could find the defendant guilty. *Id.* To sustain Griffin's claim that he is entitled to acquittal as a matter of law, undisputed and uncontradicted evidence must clearly establish that he acted in self-defense. *State v. Allison*, 845 S.W.2d 642, 645 (Mo.App.1992).

Neither Griffin nor the prosecution presented evidence of self-defense in this case. Griffin's evidence, rather than showing that Griffin had used the gun in self-defense, was that Griffin had not used the gun at all. Griffin testified that he offered Draper a ride back to her apartment when he saw Grey following her. They parked and were talking when they saw Grey sneaking between the buildings of the apartment complex. Griffin went to investigate but did not see Grey. Griffin was walking back to his car when Grey appeared and began to yell. Griffin testified

that Grey had his hand tucked in the front of his pants and that Grey began to walk and then run toward Griffin. Griffin ran to his car, retrieved a pistol from the glove compartment and put the gun in his belt. Griffin testified that when he turned back to Grey, Grey had one hand behind his back. Grey was about two and a half feet from Griffin at this point. Griffin struck Grey because Grey abruptly brought his hand from behind his back. Griffin testified that the pistol was still tucked in his belt and that he did not take the pistol out of his belt at any time during the confrontation with Grey.

The evidence does not support a finding that, as a matter of law, Griffin knowingly exhibited the pistol, in an angry or threatening manner, in self-defense. The state's evidence was that Grey was unarmed and was trying to reach his car to leave. Griffin, who was blocking the path to Grey's car, returned to his own car to retrieve a pistol, pointed the pistol at Grey, punched Grey in the mouth twice, hit Grey in the head with the pistol and then threatened to blow Grey's head off. The evidence established that Griffin was the aggressor and initiated the confrontation with Grey.

The evidence was sufficient to support the jury's verdict. Griffin was not entitled to an acquittal because there was no evidence, considering the record as a whole, which injected the issue of self-defense, much less proved self-defense as a matter of law. Point I is denied.

▪ In Point II, Griffin argues that the trial court erred in submitting to the jury Instruction 6, the verdict-directing instruction, because it did not include a reference to Instruction 5, the self-defense instruction. Griffin argues that Instruction 6 was erroneous in that it failed to require the jury to find the absence of self-defense beyond a reasonable doubt.

Use of the Missouri Approved Criminal Instructions is required by Rule 28.02(c). *State v. Cook*, 727 S.W.2d 413, 415 (Mo. App.1987). Rule 28.02(f) states that it is error to fail to follow the applicable instructions or the Notes on Use and that the prejudicial effect of such error is to be judicially determined. *Id.* The Notes on Use to MAI–CR 3d 304.02, applicable to the case at bar, require that the verdict-directing instruction include a cross-reference to each special negative defense upon which a separate instruction has been given. According to the Notes, self-defense is a special negative defense. The trial court's failure to provide the cross-reference required by the Notes on Use constitutes error. *Id.* This court must examine such error to determine its prejudicial effect. *Id.*

▪ The court is required to instruct the jury on self-defense if there is substantial evidence putting self-defense in issue, regardless of whether the defendant has requested the instruction and irrespective of the source of the evidence. *State v. Williams*, 815 S.W.2d 43, 47 (Mo.App. 1991). Even though Griffin's testimony was inconsistent with a theory of self-defense, the trial court was required to instruct on self-defense if other substantial evidence supported such a theory. *State v. Thomas*, 625 S.W.2d 115, 122 (Mo.1981).

▪ As stated under Point I, neither Griffin nor the state presented evidence which supported a theory of self-defense so the court was not required to give a self-defense instruction. Since Griffin was not entitled to a self-defense instruction, the trial court's failure to correctly cross-reference the self-defense instruction in the verdict-directing instruction did not have a prejudicial effect. Point II is denied.

▪ Griffin argues in Point III that the court erred in refusing to allow the defense to play for the jury Exhibit 21, a tape recording of a telephone call from Grey to Draper after the incident in question. Griffin argues that the tape should have been admitted because it contradicts Grey's testimony, demonstrates Grey's bias against Griffin, and proves that Grey lied during his testimony at the preliminary hearing.

After the incident but prior to trial, Draper received several phone calls from Grey. Draper arranged to tape the third such call on December 5, 1990. Griffin

cross-examined Grey about the statements he made during the telephone call. Specifically, Griffin inquired whether Grey had used racial slurs in referring to Griffin, had lied numerous times in an attempt to threaten and intimidate Draper so that she would change her testimony, and had expressed his anger and hurt over Draper's relationship with Griffin. Grey testified that he did not remember making the telephone call or any of the statements he made during the call because he was intoxicated. He did, however, admit that the voice on the tape was his voice. During his cross-examination of Grey, Griffin argued that the jury was entitled to hear the tape to impeach Grey's preliminary hearing testimony and to show that Grey was biased against Griffin. The trial court sustained the state's objections to the tape and would not allow it to be played for the jury.

During Draper's testimony, Griffin again sought the court's permission to play the tape for the jury so that the jury could make its own determination of whether Grey was intoxicated, and to demonstrate the bias and prejudice of Grey against Griffin. The trial court sustained the prosecution's hearsay objection. In both instances, Griffin offered the entire tape for admission into evidence.

The trial court is given broad discretion as to the admission or exclusion of evidence. *State v. Wahby*, 775 S.W.2d 147, 153 (Mo. banc 1989). The trial court's ruling should not be disturbed on appeal unless there has been a clear abuse of discretion. *Id.* The trial court has abused its discretion if its ruling is clearly against the logic of the circumstances or when it becomes unreasonable and arbitrary. *State v. Jack*, 813 S.W.2d 57, 60 (Mo.App. 1991). In addition, a correct trial court ruling on the admission or exclusion of evidence is not error even though the ruling is in response to a non-meritorious objection. *Kansas City v. Habelitz*, 857 S.W.2d 299, 301–302 (Mo.App.1993).

In the instant case, the prosecution objected to Griffin's request to play the tape for the jury during Grey's cross-examination on the basis that there had been no foundation laid and that it was a hearsay statement. The trial court sustained the objection. At that point in the trial, there had not been any testimony establishing the manner in which the recording was made and by whom; the accuracy of the recording and the absence of editing; the identity of the speakers and the voluntariness of their statements on the recording, as required by *State v. Spica*, 389 S.W.2d 35, 44 (Mo.1965), *cert. denied*, 383 U.S. 972, 86 S.Ct. 1277, 16 L.Ed.2d 312 (1966). The trial court was correct in sustaining the objection because there was not a proper foundation for the admission of the tape recording.

The record indicates that after the objection was sustained, Griffin advised the court that Draper would identify the tape in her testimony the next day. He also briefly described Exhibit 22, which was allegedly an excerpt of specific parts of the tape. He indicated that the individual who edited the tape would present testimony the next day, as well. Griffin, however, did not otherwise refer to the edited tape or attempt to admit it into evidence at any time during the trial.

During Draper's direct examination, she presented testimony upon all the factors required by *Spica* to lay a proper foundation for admission of that portion of the tape containing her conversation with Grey. After such testimony, Griffin made his second request to play the entire tape for the jury. The prosecution objected on the basis of hearsay. The trial court sustained the objection.

The trial court ruling excluding the tape was correct. When an exhibit contains both admissible and inadmissible material, and when the party offering the exhibit as evidence does not make an effort to offer only the admissible portions, exclusion by the trial court of the entire exhibit is not erroneous. *State v. Harvey*, 641 S.W.2d 792, 803 (Mo.App.1982). The trial court properly sustained the prosecution's objection to admission of the tape because portions of the tape were inadmissible. The tape was over an hour long. The begin-

ning of the tape contained conversations of Draper with persons other than Grey. Draper did not identify the parties to these conversations or otherwise refer to these conversations in laying a foundation for the tape. The content of these conversations was irrelevant to any issue before the court.

The dialogue between Grey and Draper included discussions of their relationships with parties other than those involved in the instant case. Grey repeatedly expressed his views on Draper's abilities as a teacher. These matters were neither relevant to Grey's bias and prejudice nor were inconsistent statements made by Grey.

Because the tape included evidence which was irrelevant and immaterial to the issues in the instant case, it was not admissible. The defense made no effort to exclude the inadmissible parts of the tape and present only the admissible evidence. Point III is denied.

The judgment is affirmed.

All concur.